[L. A. No. 16113.   In Bank.—April 1, 1938.]

In the Matter of the Estate of D. W. BELDON, Deceased. Mrs. ROSE DePARCQ et al., Appellants, v. WILLIAM J. O'BRIEN et al., Respondents.

Dempster McKee, Charles Fox, Jr., Dwight D. Bell for Appellants.

E. Swift Torrance and Wright, Monroe, Thomas & Glenn for Respondents.

EDMONDS, J.—A controversy between the heirs of William Beldon, deceased, over the construction of his will has reached this court upon an appeal from a final decree of distribution of his estate.

By an holographic will the testator made certain specific bequests, among which is one of $30,000 to his sister, Rose DeParcq. He also provided as follows: "My sister Rose is hereby appointed administratrix & executrix without Bonds

110

of this will, to the legal Descendants of Roberts (Pat) Nellies 3 children Rosemary & Will & Frances & His 2 Grandchildren 15 per cent of the balance of my estates and 10 per cent to Mikes son. after all my just Debts are paid anyones who tries to interfere with the purpose & intent of this will shall Be cut off with an allowance of not over $1.00 inheretance under this will.'' The probate court held that by the language ''Rosemary & Will & Frances'' the testator referred to the three children of Nellie Amcling, his deceased sister. The expression ''& his 2 Grandchildren'' was intended by the testator, the court found, to refer to the two children of Catherine Andres, the deceased daughter of his deceased brother, Robert, or Pat, O'Brien. This brother also had two sons, who are now living and who will share in the estate under the clause mentioning his ''legal descendants''. Another finding of the court is that by the words ''Mikes son'' the testator referred to William Loftus O'Brien, the son of William O'Brien, another deceased brother. A further intent of the testator, as found by the probate court, was that his will should dispose of all of his property. Upon these findings 7½ per cent of the residue of his estate was distributed to each of the ''2 Grandchildren'', 10 per cent to William Loftus O'Brien, and 15 per cent to each of the other persons. Rose DeParcq and William Loftus O'Brien appealed from that determination.

The testator's family name is O'Brien. He and his brothers and sisters were orphaned early in life and were ''farmed out'' to neighboring families. At the age of fifteen the testator ran away from his foster parents to make his own way in the world. Different occupations carried him to the far corners of the earth, and for many years his relatives knew nothing of his whereabouts. During and after the World War he was a member of this country's secret service, and it was then that he changed his surname to Beldon. The testator never married and in his later years he sought out his sister Rose O'Brien DeParcq and his nieces Rosemary and Frances, who are the daughters of his deceased sister, Nellie. In the course of the few visits and the correspondence that followed, a cordial friendship developed, especially between him and his sister Rose. It was she who, at a time prior to the making of his will, furnished him with

a complete list of his heirs and it was she who attended him in his last illness. At different times he wrote her that she was the executrix of his will and a legatee under it. In one letter he said: ''When the time comes inform your husband that I have specified you Rose as executrix of my estate in my will and the two copies of same and it all is left to my Brothers and Sisters or Pro Rata to their children Mikes Boy & Pats Boys & daughters children & Nells 3 living children.''

The testator's estate was appraised at almost $190,000. His heirs at law are his sister Rose, four nephews, two nieces, and two children of a deceased niece. When the various legatees named in the residuary clause of the Beldon will are identified, it appears that ''the legal Descendants'' of Pat, ''Nellies 3 children'' and the ''2 Grandchildren'' number seven persons, other than ''Mikes son''. To these persons the testator left ''15 per cent of the balance of my estates''. As ''Mikes son'' is given 10 per cent of the residue of the estate, the seven persons cannot each be given 15 per cent of it. The construction of the will which was adopted by the probate court avoided this impossible result by considering the ''2 Grandchildren'' as the legatees of one 15 per cent share, and dividing it between them. By this method the entire residue of the estate was distributed to the persons named by the testator.

The appellants concede the rule that where ambiguity exists, a construction which reaches complete testacy is proper, but they insist that the uncertainty here relates only to the identity of the beneficiaries and not to the *quantum* of the bequest. The testator, they say, has imperfectly described a group of seven people but has limited his gift to that group with absolute clarity; he has said ''15 per cent'' not ''15 per cent each''. If the appellants' position is correct, the testator died intestate as to 75 per cent of the residue of his estate.

■ ''The making of a will raises a presumption that the testator intended to dispose of all his property. Residuary clauses are generally inserted for the purpose of making that disposition complete, and these clauses are always to receive a broad and liberal interpretation, with a view of preventing intestacy as to any portion of the estate of the testator, and

this general rule is in harmony with the declaration of our code that the provisions of a will must be construed, if possible, so as to effect that purpose." (*O'Connor* v. *Murphy,* 147 Cal. 148, 153 [81 Pac. 406].) But there is no room for application of the rule if the testator's language, taken in the light of surrounding circumstances, will not reasonably admit of more than one construction. ▉ A court's inquiry in construing a will is limited to ascertaining what the testator meant by the language which was used. If he used language which results in intestacy, and there can be no doubt about the meaning of the language which was used, the court must hold that intestacy was intended. ▉ A testator has the right to make a will which does not dispose of all of his property but leaves a residue to pass to his heirs under the law of succession. Such a will is not the usual one but when the language which leads to that result is clear the will must be given effect accordingly. (*Estate of Young,* 123 Cal. 337 [55 Pac. 1011]; *Estate of Blake,* 157 Cal. 448 [108 Pac. 287]; *Estate of Johnson,* 107 Cal. App. 236 [290 Pac. 314].)

▉ Possibly David William Beldon intended to leave his property as it was distributed by the decree of the probate court. But he did not express this intention in his will. Certainly he did not intend to leave fifteen per cent of the residue of his estate to each of seven persons with ten per cent to another, and there is nothing to support the division of one of the fifteen per cent shares between the "2 Grandchildren" except mathematical necessity. To say that because a will does not dispose of all of the testator's property it is ambiguous and must be construed so as to prevent intestacy, either total or partial, is to use a rule of construction as the reason for construction. But a will is never open to construction merely because it does not dispose of all of the testator's property. "Courts are not permitted in order to avoid a conclusion of intestacy to adopt a construction based on conjecture as to what the testator may have intended although not expressed." (*Estate of Hoytema,* 180 Cal. 430 [181 Pac. 645].) Only where there is an ambiguity may the rule which directs a court to prefer that mode of interpretation which prevents intestacy, be applied. (Sec. 102, Prob. Code.) A court may not, under the guise of construction, make a will for a testator to take the place of the one made by him if

its intent is plain. And this is so regardless of the consequences of the testator's will.

The decree is, therefore, reversed.

Waste, C. J., Seawell, J., and Curtis, J., concurred.

Houser, J., concurred in the judgment.

Rehearing denied.